(Summit County Court of Common Pleas.)

### STATE OF OHIO v. OMAR H. GARDNER.

The act of April 20, 1893, 90 O. L. 446, providing a special mode of organization of government for all cities (excepting cities of the second class, third grade A having a population of 31.897) which according to the federal census of 1890 had, or which according to any subsequent census may have not less than 27,000 or more than 34,000 inhabitants (Akron and Youngstown) is unconstitutional. If considered as a special act, it confers corporate powers, and violates sec. 1 art. 13, of the consitution. If considered as a general law, it has no uniform operation throughout the state, and violates sec. 26 art. 2, of the constitution.

Any classification of cities is essentially of their organization, and under the provision of sec. 6 art. 13 of the constitution must be made by general laws having a uniform operation throughout the state.

(Decided September Term, 1895.)

---

Opinion of court on demurrer to indictment.

VORIS, J.

General demurrer to indictment under section 6900, Rev. Stat., which indictment charges that defendant unlawfully, fraudulently and corruptly did offer and promise to one Joseph Hugill, he being an officer of the city of Akron, to-wit: a city commissioner of said city duly appointed, qualified and acting and performing the duties of such office, a large sum of money, to-wit: The sum of six hundred dollars, with intent and thereby to corruptly influence said Hugill with respect to his official duty, and with intent and thereby to corruptly influence him as such commissioner, to vote in favor of requiring the use of a certain kind of paving brick, in the paving of North Forge street in said city of Akron, the matter of letting contract for paving said street, and the selection of the kind of brick to be used in said paving, being then pending before the board of commissioners of said city, of which, said Hugill was then a member.

It is also charged in another count of the indictment, that the accused offered Hugill said bribe to induce him, as such commissioner, to favor the use of a certain kind of paving brick manufactured in the city of Akron, for the foregoing purpose.

The accused urges, in support of his demurrer, that the act creating the office of city commissioner—which for convenience may be called the Akron act—is void, because of repugnancy to the constitution.

The constitutional provisions, by which the defendant seeks to test the validity of this enactment, are as follows:

First—"All laws of a general nature shall have a uniform operation throughout the state." Art. 2, sec. 26.

Second—"The general assembly shall provide for the organization of cities and villages by general laws." Art. 13, sec. 6.

Third—"The general assembly shall pass no special act conferring corporate powers." Art. 13, sec. 1.

Fourth— * * * "No law shall be * * * amended, unless the new act contains the * * * entire section amended, and the section or sections so amended shall be repealed." Art. 2, sec. 16.

The first three of these are mandatory; the fourth directory, probably, and may only apply as aiding us to see whether the legislature intended to amend and repeal general laws existing at the time of the passage of this act.

Not only do these constitutional provisions, but general laws providing for organizing, classifying and advancing municipal corporations in class and grade confront it, backed by a professional suspicion, on part of the bar, that it stands on the danger line, if not within the limits of the dead line, drawn by the constitution.

The act in contention was passed April 20, 1893, 90 O. L. 446; and among other things, provides "that the officers of all cities excepting cities of the second class, third grade 'A' (that is, Springfield, having a population of 31,897), which according to the federal census of 1890 had, or which according to any subsequent census shall have not less than 27,000, nor more than 34,000 inhabitants, shall consist of a mayor; * * * and four city commissioners, who shall be electors of said city, to be denominated the board of city commissioners, who shall be chosen by the mayor and probate judge of the county." The latter office is unknown to all the other cities of the class and grade of Akron and Youngstown, for which it was exclusively enacted. It provides that the council may, when in its opinion expedient, create by ordinance, the office of chief of police, civil engineer, superintendent of streets, sealer of weights and measures, fire engineer and superintendent of markets; * * * but when such offices are created, they shall be filled by the appointment of the board of city commissioners * * *. The act further confers on the board the power to appoint each year, an assessor for each ward; and have the care, management and control of streets, avenues, alleys, highways, public grounds, parks and public cemeteries, and the platting, opening, improving, repairing, cleaning and lighting the same; of the construction, protection and repairs of public buildings, bridges and structures of any kind, of sewerage and drainage, and all matters and things in any way relating to or affecting the highways and footways of the corporation; the appointment of all public officers, night watchmen and other officers relating to the police administration of the city; the appointment of fire force, officers and employes, inspector of buildings, etc.,—all such appointees to be under the administration of the board. The commissioners, together with the auditor of the county, shall constitute the city board of equalization; and also shall constitute the city board of elections, and perform all the duties imposed by law, and a clerk of such board shall be clerk of the board of elections. In fine, "all executive powers and duties not hereinbefore distributed, shall be vested in said board of city commissioners; provided elective officers shall serve out their unexpired terms, performing similar duties, the boards of education and health, justices of the peace and constables excepted." By sec. 17, "No franchise, right or privilege of any kind whatsoever, shall be given, granted, renewed or extended in, along or upon any of the streets, alleys or public grounds of the city, unless first recommended by the board of commissioners; nor shall any resolution or ordinance for the payment of claims or bills be passed, nor any binding agreement for the settlement of damages be made by the council, unless the payment or settlement of such claim or bill be first recommended by the board; and any such measure required to originate in the

board, which is altered, changed or amended in any particular, before taking effect, shall be concurred in by the board." Thereby conferring on the board drastic veto powers, not exercised by any other cities of the class and grade of Akron and Youngstown, as classified by general laws.

The twenty-first section provides, "that all provisions of the statutes of this state in force when this act takes effect, which conflict with any provision of this act, shall be held to be suspended by the latter as to the matters of inconsistency, and not otherwise." Does not this act amend, and in effect repeal all conflicting provisions of the general laws of the state? That is, when the general laws harmonize with this act, they shall be in force; but when they do not, they are in effect amended and repealed. This section disregards the mode required by the sixteenth section of article two of the constitution, if the act has the effect to amend and repeal such provisions of these statutes as are inconsistent with the Akron act, which effect it must have to be operative.

How the act affects the general laws directing the mode of advancing cities in grade or class, and official organization, is a most important question, affecting this contention, the answer to which is very uncertain, but would be plain, if the requirements of the constitution had been observed by the general assembly, in the passage of this enactment, as to amendments and repeals.

In the acts organizing municipal corporations under the constitution of 1851, until the revision, the terms "class" and "grade" were used, for the purpose of classification, as synonymous; and since that time, the classification of cities by the term "grade, has the same practical effect, as if the term "class" had been used instead, with appropriate numeral designation. It has been the unvarying policy of the state, ever since the act of March 11, 1853, not to advance municipal corporations to a higher grade, except by complying with the provisions of the statutes; to-wit: By resolution of the trustees of the municipality up to the time the municipal code of May, 1869, went into effect, and subsequent thereto, by the resolution of the city council and by a majority vote of the inhabitants of the municipality desiring such advancement. This policy of the state has never been directly attacked, or the law repealed; but frequently of late years, it has been covertly circumvented as to certain cities of the state, by special legislation, in direct violation of the constitution.

The amendment of section 1549, Rev. Stat., passed April 15, 1892, 89 O. L. 353, expressly provides that, "no municipal corporation shall pass into any other class or grade under the operation of this section or the preceding sections 1547 and 1548, unless the council shall have first declared by vote of two-thirds of the members thereof, that such change of class or grade is expedient." We know, as matter of fact, that the city council of Akron has declared that it is not expedient to advance. These three sections, and their amendments, are general laws, and provide for the classification of all the municipal corporations of the state. And general laws were in force at the date of this enactment, providing for the mode of advancing municipal corporations to a higher grade. These are found in chapters four and six, title twelve, division two of the Revised Statutes; and in full force for all the municipal corporations of the state, notwithstanding the suspending power of the twenty-first section of the act under review. Vide, sec. 1582, 1585, 1586, 1619 and 1622, Rev. Stat.

While the express provisions of sec. 1547 and 1548, construed without reference to the other provisions of the statute, might be held to advance the grade of cities proprio vigore, yet when taken in connection with the other provisions, it cannot be treated as having any such effect.

The Supreme Court of Ohio held, State ex rel. v. Wall et al., 47 Ohio

St. 499, that a city of a second class, does not become a city of the first class, by a simple increase of population; certain steps are required to be taken by the municipality, before it can be advanced.  These steps are prescribed in chapters four and six, division two, title twelve, part one, Rev. Stat.,    *   *   *   (decided June 28, 1890).  The opinion in that case, per curiam, recites, page 500, "from these chapters it appears that the population of a city of the second class, whether ascertained by the federal census, or by any census taken by the municipality, simply furnishes the ground for authority in such city to become a city of the first class by complying with their provisions.  And unless steps are taken, the city of the second class remains such under the provisions of section 1548, irrespective of the number of its inhabitants."  The principle here announced is applicable to advancement from one grade to another, as much as from one class to another.

We are unable to find any legislative or judicial declaration to the contrary, unless the twenty-first section of the Akron act does so.  To give it that effect, would be to overturn the thoroughly established law of the state for more than forty years, by implication—as to Akron and Youngstown only, while other cities of like class must be unaffected by it.

It is clear, that the legislature did not, in a fair sense, mean that the act last named should apply to any other cities now existing, but Akron and Youngstown.

To take Akron out of its grade provided for it by section 1548, Rev. Stat., and the general laws applicable to its grade, for the purpose of administering the affairs, so far as the same may be done by the board of commissioners in the manner named in this act, and leaving it in its grade as provided in section 1548, for other governmental purposes, leaves Akron in an anomalous condition, constituting Akron a city of the second class having at least two grades, for the purposes of municipal organization and goverment—an inconsistency not to be judicially favored. This act, if effectual, would advance or place Akron, nolens volens, in a special grade, it having taken no steps in that behalf as contemplated by the general laws of the state; but to the contrary, has properly announced its intention not to be advanced.  And would deprive Akron of the benefits of these general laws, while other municipal corporations of like grade would have them—making the general laws applicable to cities of like class and grade, not of uniform operation throughout the state.

It is further urged upon the court, by counsel for the state, that no matter if the act is repugnant to the constitution, the doctrine that gives validity to acts of de facto officers should apply.

It is true that this doctrine is founded upon considerations of public policy and necessity, for protection of the public and persons whose interests may be affected thereby, and that the good order and peace of society requires that such official authority be respected and obeyed, until in some regular mode prescribed by law, their title is lawfully determined.  It is considered better policy to uphold the authority of such officers, rather than permit the confusion that would arise if the members of society determine for themselves whether they should be obeyed or not.  But the accused insists that this doctrine cannot apply where no de jure office exists, and cites the doctrine of the Federal Supreme Court, which holds that an unconsitutional act cannot create a de jure office; and the vigorous language of Field, J., that "An unconstitutional act is not a law; it confers no rights; it imposes no duties; it affords no protection; it creates no office; it is in legal contemplation as inoperative as though it never had been passed."  Norton v. Shelby County, Tenn., 118 U. S. 178.

I cannot accept, without qualification, this language as being a safe solution of the question presented for our determination.

The Akron act has been in force, recognized and approved as the law of the land by all the departments of the state and city governments, and the people generally; and until properly invalidated in the regular mode prescribed by law, acts under and pursuant to it, ought to be upheld. The conclusion that Justice Field announces, certainly is correct, after adjudication against the validity of the act; but before that time, it seems to me that the doctrine applicable to a de facto officer ought prevail, when an office has been created by the regularly constituted authority, though it may have exceeded its authority and enacted what may finally be declared invalid because of constitutional infirmity. We think the doctrine is stated too broadly for a general principle, in Norton v. Shelby County, supra. In that case the federal courts followed the holding of the domestic courts of Tennessee, under which the cause of action arose and the rights were litigated.

The Supreme Court of Ohio announces the rule differently, in Ex parte Strange, 21 Ohio St. 610. White, J., says: "The doctrine seems to be, that it is sufficient if the officers held the office under some power having color of authority to appoint, and that a statute though it should be found repugnant to the constitution, will give such color." But the case of Ex parte Strange, was a proceeding in habeas corpus, in which the authority of the police judge was attacked collaterally, and under our practice, did not properly raise the question—a rule that would not apply where the party directly resists the assumed exercise of authority by proper legal procedure. But when the power is presumed to exist, and the party avails himself of the official authority for his own benefit, he ought not to be permitted to repudiate the existence of the office. A clean cut distinction exists between cases where a party resists, and where he avails himself of de facto authority. But whether this should apply in a criminal proceeding is a matter not so satisfactorily answered, and does not come before the court in the light of direct authority.

In the case at bar, the law has been enforced in all its provisions by the board of city commissioners, and no one has questioned its validity or the acts done by its commissioners under it, until raised by this demurrer. The matter of intrusion by the commissioners into the office, or usurpation of official powers, has hardly been the subject of suggestion even among the inhabitants of the city. To hold that the whole administration of the board, thus acquiesced in, should be treated as null and void, shocks the sense of mankind, and tends to destroy all confidence in the validity of public administration.

If this were a new question, I would have little hesitation in holding that the office so created, as long as acquiesced in, could not be impeached by persons recognizing its existence for their benefit, until the same had been declared invalid by competent authority; otherwise, disastrous confusion, instead of law, would prevail.

I am disposed to adopt as matter of personal judgment, the latter view, but for judicial determination of the question, I think it more expedient to adopt the doctrine announced by Justice Field, as the matter will go up, on the judgment entered on the demurrer without a trial of the issues of fact, and if I am sustained by the reviewing court, such determination will end the case; if not, it will come back for correction of errors with the law settled as to the validity of the office in contention.

But as to the main contention, we think it a fair analysis of the act, to say that it attempts to take Akron and Youngstown out of the class and grade to which these cities belong, by the 1546 and 1548 sections of the

Revised Statutes, as they existed at the time the Akron act went into effect, and as exhibited in the amendment thereof, passed March 13, 1894, 91 O. L. 58, which was an amendment of the same sections passed February 6, same year, which was an amendment of the same section passed February 10, 1892; by the way, very much amended sections,—suggestive that the general assembly had a very shadowy conception of stable legislation for the purposes of municipal organization.

The Akron act provides officers for Akron and Youngstown, not given to the other cities of their class and grade by section 1707, Rev. Stat., and however this section may have beeen affected by the 18th and 21st sections of the Akron act, it was so amended May 14, 1894, 91 O. L. 236, as to provide for the official force, among others, of cities of the second class, third grade, the class and grade of Akron, as provided by general laws; but sec. 1707, as amended, does not include a board of city commissioners, and in no sort attempts to except either Akron or Youngstown from its operatioL, a law which is operative by the force of the enactment, while the law establishing class and grade is not.

The scheme of the general law is, that existing municipal corporations shall remain of their respective class and grade until, having requisite population, they may advance by the determination of the electors expressed at an election provided for, whenever two hundred resident freeholders shall petition therefor. And if a majority vote favor such advancement, and the corporation, according to the federal census, or census taken by order of the council, contains the requisite number of inhabitants, the council shall thereupon, by resolution, declare that the inhabitants have decided on such advancement, and direct the clerk to certify the resolution for record, and so being recorded, and a certificate of the record being transmitted to the secretary of state, it shall thereupon be a city of such advanced grade, Rev. Stat., 1582, et seq.; and the requisite population is determined in this wise: cities which on the first day of July, 1890, had, or which on the first day of July in any year have, ascertained by mode provided by law, more than —— and less than —— shall constitute the — grade. A method most easy of accomplishment.

Sections 1546 and 1548, as amended March 16, 1894, and as they now exist, organize municipal corporations as follows: "Municipal corporations are divided into cities, villages and hamlets; cities are divided into two classes, first and second; cities of the first class are divided into three grades, first, second and third; cities of the second class are divided into seven grades, first, second, third, third "A," third "B," fourth and fourth "A;" cities of the second class, which hereafter become cities of the first class, shall constitute the fourth grade of the latter class, and villages which hereafter become cities, shall belong to the fourth grade of the second class.

The following summary of section 1548, will show how they are classified according to population:

### First Class Cities.

| | | | | |
|---|---|---|---|---|
| 1st grade, | 200,000 inhabitants & upwards, | Cincinnati, | 296,908, | census 1890 |
| 2nd " | 90,000 " to 200,000, | Cleveland | 261,358 | " |
| 3rd " | 31,500 " to 90,000, | Toledo | 81,431 | " |
| 4th " | cities advanced from 2nd class, | Canton | 26,189 | " |

### Second Class Cities.

| | | | | |
|---|---|---|---|---|
| 1st grade, | 30,500 to 31,500 | Columbus | 88,150, | census 1890 |
| 2nd " | 20,000 to 30,500 | Dayton | z. 61,230 | " |
| 3rd " | 10,000 to 20,000. | This grade includes: | | |

Akron,　with　　27,607, census 1890  
Chillicothe,　　11,238　　　"  
Hamilton,　　　17,565　　　"  
Portsmouth　　12,394　　　"  
Sandusky,　　　18,491　　　"  
Steubenville,　13,394　　　"  
Youngstown,　　33,326　　　"  
Zanesville,　　21,009　　　"  

3rd grade "A" 28,000 to 33,000　　Springfield,　31,897.  
3rd　"　　"B" 16,000 to 18,000 to catch Hamilton with 17,565.  
4th　"　　　5,000 to 10,000.  
4th　"　　"A" 8,330 to 9,500 (Ashtabula) 8,338.  
Villages first class 3,000 to 5,000.  
　"　second　"　200 to 3,000.

Canton in 1893, leaped from the fourth grade, second class, to fourth grade first class,—an insensible grade by the way, because no laws are in force for cities of first class, fourth grade; except in name she is a city of the second class fourth grade, and governed by the laws that applied to her before advancing. Eight cities of the fourth grade of the second class were entitled to advance under general laws in force, by their population, as indicated by the federal census of 1890; but still deem it inexpedient to go up. Columbus, Dayton, Youngstown and Springfield might advance to first class cities by their number of inhabitants by census of 1890; and by the same rule, Cleveland might be a city of the first class, first grade; and Akron by its population of 1893, might so advance to first class, third grade. None of which cities have deemed it expedient to change their class and grade.

This election not to advance, as population brings these cities forward, very clearly indicates, that there is no pressing demand for enlarged classification. The classification adopted by the several amendments of sections 1546 and 1548 is bad enough; but when taken in connection with the attempted classification by special enactments, creates a heterogenous and confused aggregation of municipal corporations, not compatible with any rational or practical classification, and wholly inconsistent with stable municipal government; and well calculated to awaken the scrutiny and suspicion of the courts. These cities show that the electors are in no great haste to advance; that no real demands exist for the number of grades provided for by special laws, much less for classification by special enactment, and demonstrate the shallowness of the pretense for the classification of cities by the designation of third grade "A," and third grade "B," and fourth grade "A"; legislation which can be viewed in no other light than special enactments for the organization of Springfield, Hamilton and Ashtabula, upon no basis recognized by the constitution, and that excludes them from the respective grades in which they are classified by the general law, and that prevents the uniform operation of these general laws. When general and special laws provide for the organization and government of municipal corporations, the courts should have no difficulty in determining which should give way.

What consistency can there be in the effort to place Akron and Youngstown, by the act of April 20, 1893, into a special classification that embraces all cities of the second class, first grade, and part of cities of second grade, and part of cities of third grade, first class, according to the classification provided by general laws of the state, and at the same time exclude these other cities from the operation of this act? It is founded on no rational basis, and can have no solid reason for continu-

ance. Can general laws organizing and governing cities of the second class, third grade, be operative for all other cities coming within this class and grade, but held in suspension for Akron and Youngstown? The Akron act presents just this problem for solution. If they can, then the constitutional barriers set out in the outset of our opinion, might as well be abrogated.

Why does not Akron still have its election to determine for itself whether it will remain a city of the second class, third grade, or be a city of the first class, third grade, or any intermediate grade under existing laws, when the general laws give this election to the other cities of like class and grade? If not, it involves a radical revolution in its organization and its administrative official force not given to other cities of its grade, and overrides the right of the election of the city to remain a city of the third grade, second class, and be governed by the general laws applicable thereto.

Though the Akron act be wholly valid, it appears to me on the principle announced by the Supreme Court in State ex rel. v. Wall, supra, that it, "simply furnishes the ground for authority of the city to become a city of the class provided by the act on complying with the provisions of chapters four and six, and until such steps are taken, it remains in the class and grade of its election. When and how did Akron cast off its short clothes and assume the dignity of a patrician?

But does the Akron act suspend these chapters? The essential subjects of which are of the organization of the cities of Akron and Youngstown; to be valid, it should have uniform operation throughout the state. But if valid, the amended sections 1546 and 1548, passed March 13, 1894, now in force, ignore the classification of Akron and Youngstown provided by the Akron act, which act confers almost the whole of the administrative power of these two cities upon new instrumentalities, and creates for them new officers not given to the other cities of their class and grade,—creating a confusion of legal condition not compatible with sound maxims of government, nor with the established prerogatives of the general assembly. The act of March 15, 1894, being a general law, and the latest announcement of the law-making power, should prevail, and read in connection with sec. 1707, Rev. Stat., as amended May 14, 1894, 91 O. L. 236, which we have already shown, ignores the office of city commissioners, and must include Akron in its provisions unless the act of April 20, 1893, is beyond the power of subsequent legislative enactment—a presumption subversive of continuing legislative powers not to be entertained.

While the classification of the revision of 1880 has the approval of the Supreme Court, the holdings of which may be classed as stare decisis, yet we can find no approval of that court, or reason, that justifies the bastard progeny of the general assembly of the last few years.

It is a fundamental doctrine with us, that the whole political or governmental power of the state is vested in the people. So jealous are our people of this right, that they caused to be inserted in the constitution, "That all powers not therein delegated, remain with the people." Art. 1, sec. 20. When the exercise of a power is denied in the constitution, and this may be expressly or impliedly done, any exercise by the general assembly, of the powers so denied, would be an usurpation, and entitled to no respect. Enactments so made are void. This rule applies, without exception, to all the provisions of the constitution which are mandatory upon the general assembly.

To hold otherwise, would be to nullify the express provisions of the constitution.

A review of our legislation for municipal and local governments, for

the last 25 years, taken in connection with the constitutional provisions regulating the exercise of legislative power, is not flattering to the general assembly, and has brought forward a mass of incongruous and special legislation, greatly detrimental to the stability of municipal government, and frequently without regard to the constitutional requirements. The courts frequently have yielded their better judgment to a rule of statutory construction, which considers all acts of legislation in the light that the powers of a co-ordinate branch of the state government have been properly exercised; and this, whether the act of legislation comes within the discretionary powers of the general assembly, or within the limits of such as are withheld by the people. While the people committed the legislative powers to the general assembly, they did so, however, with specific limitations, and for the most cogent reasons;—experience had taught our people, that the legislature had previously indulged in unwise, local, special and partisan legislation, greatly to the prejudice of the public welfare, which led us more than forty years ago, to put well defined limitations upon the subjects and modes of making laws by legislative enactments. While the people conferred the power to make laws upon the general assembly, they did so subordinate to the provisions of the constitution already quoted by us. These restrictive and mandatory provisions were incorporated into the constitution, as essential barriers to protect the people form legislative abuses, and keep the law-making department of the government within safe methods of procedure, and to prevent special legislation within the prohibited lines.

Within the boundaries of the powers granted by the constitution, every intendment favors the validity of the acts of the general assembly; outside of these, no such favorable presumption exists, or should be extended by, or to any co-ordinate branch of the state government; except that no improper exercise of powers is to be presumed by one against the other, in the absence of evidence to the contrary. These views are thoroughly founded in considerations of sound public policy. If we held to the contrary, these reserved rights of the people, when encroached upon, would be placed upon an unequal footing with the assumption against them. We think that whenever the courts treat of the intendment favoring the validity of legislative enactment, it is meant with reference to, and limited by the foregoing qualifications. If this view did not obtain, then such aggressions upon the reserved rights of the people, would hold higher judicial favor than these sovereign rights of the people. The stability, justice and character of the state government depend upon a just, rigid and inflexible enforcement of the constitution, whenever and by whomsoever its provisions are invaded.

The traditions of our English ancestors and English contemporaneous constitutional doctrines, do not furnish a proper, or safe guide for our people, whose government is founded on a written instead of a traditional constitution, and have frequently found entirely too high judicial favor in American jurisprudence, especially in the dicta of the judges.

The conservative sense of our people is alarmed at the extraordinary development of legislation, especially at local and special, which since the 1st of January, 1890, is exhibited in the six large volumes before me, covering over 4,100 pages. The 69th general assembly enacted 729 general and 868 local laws; the 70th, 824 general and 944 local; the 71st, 363 general, and 566 local laws. In all, 1,916 general, and 2,374 local laws. Of these, the 69th enacted 288 general laws for the organization and administration of municipal corporations; the 70th, 174; and the 71st, 61,—in the aggregate, 523 general laws in five years, an average of more than one hundred for each year. And my brethren at the bar wonder, that where there is

so much law, there is such uncertainty. The last general assembly—a re-
formed legislature, I believe it has been called, set a splendid example of
loyalty to the constitution, by making only 61 general laws for the admin-
istration and organization of municipal corporations, and 202 local laws
for the same purpose. It did one thing for which the people are truly
grateful—it fell back to the constitutional plan of holding bi-ennial ses-
sions and promptly covered into—their pockets the annual salaries,—a
most justifiable act under the circumstances for this best legislative ser-
vice rendered for many years; and an economical investment for the state.
The payment of salaries to the law-makers to keep them from making
laws, is wise, and may be continued with profit to the state.

It is also true of the great bulk of the local and special legislation
of the state, that general laws are in force to meet local and especial ex-
igencies in a much better, and less expensive way to the public. But such
is legislative complacency to the unreal wants of ignorance or selfishness
of persons or committees, that the whole machinery of legislation is let
loose to do what the courts, county commissioners, township trustees,
school boards, and municipal corporations can do better, and with little
or no expense under existing laws.

A large percentage of the expense of litigation, the uncertainty, con-
fusion and prolixity of the laws relating to municipal corporations, and
the consequent degradation and extravagance of municipal administration
would be averted, if the constitution were intelligently and loyally ob-
served by the general assembly in making up the municipal legislation of
the state. Whenever and wherever this is not done, the courts should
assert their powers fearlessly. It will not do for the courts to say, that
upon the general assembly rests the obligation to provide proper laws, and
if this is not done, they alone should bear the odium, until the people ex-
act legislative reforms;—that the people should suffer the consequences
until they arise and correct the evil. Nor will it do to say, that the in-
convenience, which at times is very great when adjustments have been
made, occasioned by nullifying the statutes, ought to make the courts
specially indulgent towards constitutional infirmity. This is a flimsy
makeshift at best, to shield legislation from adverse judicial determina-
tion, not to be encouraged by the courts.

We think it high time that the judiciary should courageously assert
its prerogatives to confine law-making within the limits enjoined by the
constitution. In this respect the judiciary of Ohio has been vacillating
and timid. The short terms and elective features of the judicial office,
and the depraved influence of the caucuses on the independence and char-
acter of those elected, has deprived the judiciary of much of its virility
and ability.

It is the duty of the courts, whenever the matter comes before them,
to see that these most salutary requirements of the constitution are ob-
served and upheld in the legislation of the state, and in all cases where ju-
dicial determination is invoked, to prevent encroachments upon the con-
stitution. The courts should construe legislative enactments, so as to
preserve the spirit and plain intent of the constitution, inviolate and in-
dependently of any construction the general assembly may have given to
that instrument; otherwise, the constitution may be wholly ineffectual to
preserve the rights of the people therein guaranteed.

The act in review confers corporate powers upon Akron and Youngs-
town through the board of city commissioners, and organizes these two
cities upon a basis of a special grade for purposes of municipal govern-
ment; suspends the operation of general laws as to them, while these sus-
pended statutes must remain in full force as to the other cities of the state

of the same class and grade, or throw the laws regulating the organization of municipal corporations into inextricable confusion. No man can tell on which horn of the dilemma, Akron and Youngstown hang.

Any classification of cities is essentially of their organization, and must be made by general laws which must have uniform operation throughout the state. We concede that this may be done by a classification that may combine but a very few cities, but such classification must be founded in reason, and upon some recognized conditions peculiar to the cities of the class and different from the other cities to be valid. But classification, according to the number of inhabitants has been the cardinal rule. That no other such conditions exist for Akron and Youngstown, is demonstrated by the fact that the Akron act retains the classification for these two cities according to population. No matter which way we may hold it to be, either a general or special law, its provisions are repugnant to the constitution. If a general law, it does not have uniform operation throughout the state; if a special law, it confers powers not compatible with special legislation.

Whatever view may be taken of the plan adopted in this act for the organization of Akron and Youngstown, we are compelled to think that the act of its own force does not take Akron out of the place its class and grade by general law gives it; and in which it has elected to remain pursuant to the fourth and sixth chapters before referred to.

What then is the legal status of Akron? We think it more reasonable to hold that it is a city of the second class, third grade, and governed by the general laws applicable to such cities, and that the act of April 20, 1893, is inoperative to create the office of city commissioner, so far as the city of Akron is concerned.

We therefore hold, that there is no such officer as city commissioner, and sustain the demurrer.

It seems to me that I cannot better discharge the great responsibility imposed upon the court in passing on the validity of this act, than to utter judicial protest against the indifferent tendencies of legislation, as to the constitutional obligations and limitations, and magnify judicial loyalty to the paramount law of the state.

Patriotism and official duty alike demand of the judiciary, that the power reposed in the courts be at all times effectual, to save the constitution from contempt and overthrow.